# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

MONICA RICO TOBAR,           *        CIVIL ACTION

       Plaintiff,           *

    v.                            *

UNITED STATES OF AMERICA,    *

       Defendant.           *        NO. CV208-057

## ORDER

On September 14, 2009, the Court conducted a liability phase bench trial. After hearing the testimony of ten witnesses and considering the evidence tendered, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure:

## Overview

Ms. Tobar slipped and fell in the lobby restroom of the Federal jail where her son was incarcerated. She claims the government is responsible for the fall and her resulting injuries.

Ms. Tobar is, by all accounts, a pleasant and humble person who sustained injuries in the fall. However, the

lawsuit must end in favor of the Defendant.  This is so because the great weight of the evidence shows that the government conformed to the standard of care required when visitors enter the premises, even if those visitors could be classified as invitees.

## **Findings of Fact**

The Court makes the following findings of fact:

*The Plaintiff*:

(1)

Monica Tobar lives in Palm Beach Gardens, Florida.  Her son is incarcerated in the Federal Correctional Institute in Jesup, Georgia (FCI Jesup).

(2)

Tobar was severely injured in an automobile accident in 1984 that also killed her husband.  As a result of the car crash, Tobar was in a coma for weeks, cracked her skull, lost fragments of her skull, fractured her knee, fractured her femur, suffers from a diminished sense of smell, and experiences problems with the optic nerve in one eye.  She does not drive, does not have a driver's license, walks with

a cane, and wears a custom built-up tennis shoe on one foot because one leg is $2^3/_4$ inches shorter than the other.

(3)

The year after her catastrophic car accident, Ms. Tobar fell and injured her leg during a Shrine Convention.  Ms. Tobar is on full Social Security disability.

*The Visit*:

(4)

Ms. Tobar visits her son, Lawrence, on a monthly basis. She must have someone drive her, and typically that someone is her sister, Manuela Rico, who, as Lawrence's aunt, also visits him in jail.

(5)

On March 26, 2007, Tobar and Rico arrived at FCI Jesup for visitation between 1:00 and 1:30 p.m.  They entered the lobby where they filled out paperwork.  Federal Bureau of Prisons Senior Officer Specialist Marcus Scott is the only government employee stationed in the lobby area.

(6)

It is Marcus Scott's duty to ensure that only authorized staff and visitors enter and (more importantly) exit the federal prison.

(7)

Visitation hours are from 8:00 a.m. until 3:00 p.m. However, visitors cannot enter after 2:30 p.m. Visitors are escorted through a security checkpoint, out of the reception lobby, and into the prison visiting area where they are reunited with the inmate they are approved to see.

(8)

Jeffrey Coughlin, an Administrator at FCI-Jesup, testified that visitation is encouraged by the Bureau of Prisons. Visitation helps inmates maintain community and family ties that can help them upon reentry into the community. Visitation also helps the staff keep the inmates orderly and well-behaved. It is a privilege that can be withdrawn for bad behavior and restored for good behavior.

(9)

On March 26, 2007, Tobar wore shorts. Visitors must wear long pants in order to see an inmate. Officer Scott told Tobar that she could change clothes if she so desired.

Tobar did not bring a pair of pants. She did not think she and her sister could leave, drive to a store, buy pants, and get back to the lobby area before 2:30. Therefore, Manuela Rico completed the visit while the shorts-clad Tobar waited in the car in the prison parking lot.

(10)

No one ever told Tobar she could not remain on the premises while she waited for her sister to complete the visit with Lawrence. She understood that for security reasons, she should not wait in the lobby. Therefore she moved to the parking lot.

*The Fall*:

(11)

While waiting in the car for Manuela Rico to complete her visit with Lawrence, Tobar decided to leave the car and walk back into the lobby to use the restroom.

(12)

At approximately 2:55, just before visitation ended, Ms. Tobar reached the lobby and asked Scott if she could use the restroom. He replied something to the effect of "of course."

-5-

(13)

Tobar was entering the restroom close to the time Rico was exiting the visitation area to enter the lobby.

(14)

Tobar describes the lighting of the restroom on that day as "semi-lit". Tobar testified that she maintains a heightened awareness of conditions that might cause her to fall. She was concerned about what she testified was poor lighting, but she opted to venture ahead because she opined that perhaps there might be repercussions to her son if she mentioned the lighting.

(15)

Tobar testified that as she turned to seat herself on the toilet, she slipped and fell. Her shorts and undergarments were at mid-thigh level. Tobar testified that she saw liquid on the floor below the toilet.[1] Tobar testified that the liquid was clear to yellowish in color and 1½–2 cups in amount.

---

[1]Tobar was not entirely clear in her testimony as to whether she saw the liquid as she fell or once she hit the floor. Her deposition testimony was somewhat at odds with her trial testimony in that regard.

Tobar screamed.  Her sister, who was just exiting, entered the restroom.  She testified that she saw liquid around her sister and that Rico "didn't know if she (Tobar) had gone to the bathroom, you know, in that moment or what type of liquid it was."  Rico testified that she kept others from entering for a while out of an initial concern for her sister's privacy.  During the time others were blocked from entering, Rico placed paper towels around the liquid surrounding her sister.  Rico, too, testified that the lighting was dim.

Tobar was eventually transported to the hospital where she was admitted for injuries to her leg.

On March 26, 2007, just after the fall, William Murtha, a plumbing foreman at FCI Jesup, performed a full inspection of the restroom.  He found no leaks or plumbing problems.

Multiple witnesses, including Rodney Hollis, William Murtha, Bolaji Aremu, and Lori Harris, testified during the trial that they entered the restroom on the day of the fall

and did not find any problems with the lighting.  Tobar and Rico were the only witnesses who characterized the restroom light as dim.

*The Restroom:*

(20)

At the time of Tobar's fall, there was a men's restroom and a women's restroom in the lobby reception area.  There were additional restrooms beyond the security portal in the actual visitation room.

(21)

The women's restroom in the lobby reception area had a tile floor.  It contained a wall-mounted toilet, sink, mirror, overhead light, and a second light mounted over the mirror.  The door would close but, given the nature of the setting, was designed to not lock.

(22)

The restroom was not within Officer Scott's line of sight.  A solid wall obscured his view of the restroom door.

(23)

During Officer Scott's service, he had never heard any complaints about the maintenance or condition of the women's restroom.

(24)

Inmate orderly Rodney Hollis had responsibility to check and clean the restroom three times a day, seven days a week.

(25)

For the first daily cleaning, Hollis would leave his quarters at 8:00 and arrive at the restroom area at 8:15 to 8:20. He would damp mop the floor, clean the toilet, clean the sink and remove the trash. He would check for leaks and was required to report any leaks he discovered.

(26)

For the second daily cleaning, he would leave his quarters around noon and arrive at the restroom area around 12:15 to 12:20. He would damp mop the floor and repeat the other cleaning and inspection procedures employed during the morning cleaning.

(27)

For the third daily cleaning, he would leave his quarters around 4:00 p.m. and arrive at the restroom area around 4:15 to 4:20. He would repeat the morning and noon ritual except that he would actually wet his mop and wet mop the bathroom floor for the end of day cleaning and inspection.

(28)

In addition to the thrice daily cleaning and inspection, FCI-Jesup has a Safety Manager, Shawn Stanley, who conducts monthly safety inspections of every room in the facility to look for safety hazards, including water or leakage hazards.

(29)

No inspection had ever uncovered any water leakage or lighting problem in the lobby restroom from 2006-2008.

(30)

On the day of the fall, Hollis cleaned and inspected the restroom as usual that morning. He found no problems or hazards.

(31)

On the day of the fall, Hollis cleaned the restroom as usual at noontime. He arrived at 12:15 to 12:20. He found the restroom floor was dry and the lights were working well. He checked for leaks and found none. He cleaned the sink and damp mopped the floor.

(32)

Hollis remained in the lobby area until approximately 1:00 p.m. of March 26, 2007.

(33)

Officer Scott testified– convincingly and without direct contradiction– that the average number of visitors who use the women's restroom located in the lobby is ten to fifteen people per day.

(34)

Tobar had used the lobby restroom each time she visited her son.

## Conclusions of Law

The Court makes the following conclusions of law:

*Summary*:

(1)

As explained below, under the peculiar facts of this case, it is a close question whether Tobar was an invitee or a licensee at the time of her fall.

(2)

However, the credible and quite ample evidence adduced at trial showed so clearly that the Defendant fulfilled its duty and complied with the requisite standard of care owed to visitors such that the government cannot be held liable, even if Tobar is classified as an invitee. That is, the government conformed to the higher standard of care owed to invitees. Even if Tobar is classified as an invitee, the great weight of the evidence demands a conclusion that the government must prevail.

*Premises Liability*:

(3)

This Federal Tort Claims Act case calls for the application of Georgia negligence and premises liability law.

(4)

Under Georgia law, the Plaintiff bears the burden of establishing four elements:

(1) a legal duty to conform to a standard of conduct raised by the law for the protection of others against unreasonable risks of harm;
(2) a breach of this standard;
(3) a legally attributable causal connection between the conduct and the resulting injury; and
(4) some loss or damage flowing to the plaintiff's legally protected interest as a result of the alleged breach of the legal duty.

See Bradley Center v. Wessner, 250 Ga. 199, 200, 296 S.E.2d 693 (1982); see also Galanti v. United States, 709 F.2d 706 (11th Cir. 1983).

(5)

The specific duty of care owed by a landowner to a person entering his land changes according to the status of the person entering the premises. Jarrell v. JDC & Assoc., LLC, 296 Ga. App. 523, 525 (2009); see O.C.G.A. § 51-3-1.

(6)

A landowner owes the highest duty to an invitee, and that highest duty is the duty of ordinary care. A landowner owes a lesser duty to a licensee, and that lesser duty is to avoid causing wilful or wanton injury. Jarrell, 296 Ga. App. at 525; see O.C.G.A. § 51-3-2.

-13-

Georgia courts have not yet decided whether inmates' visitors are invitees or licensees of the prisons they visit.  Other courts have.  <u>Levy v. State</u>, 22 Ill. Ct. Cl. 694 (1958) (invitee); <u>Blair v. Ohio Dep't of Rehab. & Corr.</u>, 582 N.E. 2d 673 (Ohio Ct. Cl. 1989) (invitee); <u>Lewis v. U.S.</u>, 702 F. Supp. 231, 234 (E.D. Mo. 1988)(invitee); <u>Linn v. U.S.</u>, 979 F. Supp. 521, 523 (E.D. Ky. 1997) (licensee).

*Invitees and Licensees*:

(8)

Under Georgia law, an invitee is one who enters the premises for any lawful purpose "by express or implied invitation."  § 51-3-1.  However, for an "express or implied" invitation to exist, a "privity of interest" must exist between the owner or occupier of the premises and the purported invitee.  <u>Epps v. Chattahoochee Brick Co.</u>, 140 Ga. App. 426, 427-28 (1976).  The "accepted test" for invitee status in Georgia is whether the purported invitee's presence is of "mutual benefit" to the purported invitee and the landowner. <u>Moore-Sapp Investors v. Richards</u>, 240 Ga. App. 798, 799 (1999); <u>accord Anderson v. Cooper</u>, 214 Ga.

-14-

164, 169 (1958) (courts should look for "real or supposed"
benefits to landowner and purported invitee); Matlack v.
Cobb Elec. Membership Corp., 289 Ga. App. 632, 634 (2008);
Clark Atlanta Univ., Inc. v. Williams, 288 Ga. App. 180, 181
(2007); Nye v. Union Camp Corp., 677 F. Supp. 1220, 1223
(S.D.Ga. 1987).

(9)

A licensee, in contrast, is one who "is permitted,
expressly or impliedly, to go on the premises merely for his
own interests, convenience, or gratification." O.C.G.A. §
51-3-2; Behforouz v. Vakil, 281 Ga. App. 603,603-04 (2006).

(10)

In the present case, the Plaintiff has presented strong
evidence showing that the parties receive mutual benefits
from prison visitation. Obviously, the visitors, such as
Tobar, receive benefits. Tobar wants to see her son.
Contact with him is valued by her.

(11)

What is less obvious but no less true is that a prison
benefits from such visits as well. The Federal Bureau of
Prisons's regulations explicitly encourage visitation:
"[t]he Bureau of Prisons encourages visiting by family,

friends, and community groups to maintain the morale of the
inmate and to develop closer relationships between the
inmate and family members or others in the community."  28
C.F.R. § 540.40; accord Blair, 582 N.E.2d at 678
(correctional institutions encourage relatives and friends
to visit inmates).

(12)

Because inmates enjoy visitors, visitation gives prison
officials a tool for managing inmates.  "Withdrawing
visitation privileges is a proper and even necessary
management technique to induce compliance with the rules of
inmate behavior."  Overton v. Bazzetta, 539 U.S. 126, 134
(2003).  By allowing friends and family like Ms. Tobar to
visit inmates, penal institutions provide themselves with a
"carrot" that prison officials make take away, if necessary,
to maintain inmate discipline.  Indirectly, at least,
visitation may be viewed as benefitting prison officials.

(13)

The government's position was well, clearly, and logically
articulated: While others who actually gain entry to visit
inmates may be invitees, the peculiar circumstances of this
case demand a different conclusion.  The government argues

that Tobar's status changed once she was denied entry. At the
point of denial, argues the government, the mutuality ceased.
Absent any mutuality, Tobar's status changed from an invitee
to a licensee.

(14)

The reply is, of course, that because of Ms. Tobar's
unique characteristics under the unique facts of this case,
some mutuality actually remained. That is, Tobar's sister
went on to visit the inmate. Such a visit would only be
possible if Tobar remained on the premises. Because Tobar is
a fully disabled person with vision challenges who is
dependent on a cane and prosthetic $2^3/_4$-heeled shoe, Tobar's
sister could not have visited the inmate unless Tobar could
remain. See Cooper v. Anderson, 96 Ga. App. 800, 807 (1957)
(en banc) (child accompanying parent-customer is invitee
because "patronage of the parents depends upon the privilege
of bringing the children"); see also Etheridge Motors, Inc. v.
Haynie, 103 Ga. App. 676, 677 (1961).

(15)

Such a tenuous grasp on mutuality under the very unique
facts of this case is barely enough to continue Ms. Tobar's
status as an invitee. The mutuality is minimal and once-

-17-

removed.  Fortunately for clarity and fairness's sake, the decision in this case need not and does not rest on so slender a distinction, so close a call.  For regardless of whether Ms. Tobar could still (or ever) be characterized as an invitee, the great weight of credible evidence shows that the Defendant complied with the standard of care required in hosting visitors– even visitors classified as invitees[2].

*Standard of Care*:

(16)

In order for an invitee to recover for injuries sustained in a slip and fall action in Georgia, a plaintiff must show:

(1)   that the defendant had actual or constructive knowledge of the hazard; and
(2)   that the plaintiff lacked knowledge of the hazard despite the exercise of ordinary care due to actions or conditions within the control of the defendant.

---

[2]In a case where the weight of the evidence shows the defendant lived up to the duty to avoid wilful or wanton injury, but fell shy of the duty to exercise ordinary care, classification of the plaintiff's status is outcome determinative.  The distinction is not outcome determinative at the trial stage in a case such as the present one where in weighing the evidence and assessing credibility, it is clear that reasonable and ordinary care occurred, entitling Defendant to prevail regardless of whether the Plaintiff was an invitee or a licensee.

Robinson v. Kroger, 268 Ga. 735, 493 S.E.2d 403, 414 (1997).

(17)

In the present case, the government did not have actual knowledge of any hazard in the bathroom. No evidence was introduced showing actual knowledge of any problem with water or lights. To the contrary, significant evidence was introduced showing that there had not been problems or complaints about any safety hazards in that particular bathroom. No one had voiced complaints or concerns about lighting or water problems. Furthermore, the Plaintiff admits that she has no evidence of actual knowledge on the part of any employee of the Defendant.

(18)

To show "constructive knowledge," the Plaintiff can follow either of two avenues. The Plaintiff may show that one of the Defendant's employees was in the immediate area of the foreign substance and could easily have seen it, or the Plaintiff could show that the substance remained on the floor long enough that, by exercising ordinary care, the Defendant should have discovered it. Brown v. Piggly Wiggly Southern, Inc., 228 Ga. App. 629, 631 (1997). In any case where constructive knowledge of the hazard exists, however,

-19-

"the substance [must] have been on the floor for a
sufficient length of time to give the defendant an
opportunity to discover it." Mitchell v. Food Giant, Inc.,
176 Ga. App. 705, 706 (1985) (en banc).

(19)

The Court finds that Plaintiff was unable to satisfy
either of the two methods for proving constructive
knowledge.  First, there was no employee of the government
in the area who could easily have seen the restroom.  Here,
the closest employee was Marcus Scott, who could not have
easily seen the area of the fall.  He is not charged with
leaving his post to inspect the women's restroom.  He is the
front line security worker determining who enters (and more
to the point) exits a federal correctional facility.  A
solid wall obscures his view of the restroom area
continually.

(20)

Second, based on a credibility assessment of the
witnesses involved, this Court finds that the substance was
not on the floor long enough that, by exercising ordinary
care, the Defendant should have discovered it.

(21)

A reasonable and operating inspection procedure can negate constructive knowledge. An owner is allowed a reasonable amount of time to exercise ordinary care in inspecting and maintaining a premise in a safe condition. <u>Winn Dixie Stores. Inc.. v. Hardy</u>, 138 Ga. App. 342, 226 S.E.2d 142 (1976). Additionally, an owner is not required to constantly check his property unless there are facts which would show that the property is particularly dangerous. <u>Id.</u>; and <u>Food Lion v. Walker</u>, 290 Ga. App. 574, 660 S.E.2d 426 (2008).

(22)

After considering all of the evidence put forth at trial and after assessing the credibility of the witnesses, the Court finds that the Defendant had a reasonable inspection procedure in place and that it was carried out on the day of Tobar's fall.

(23)

To the extent Plaintiff complains about the lighting level in the restroom, the Court finds that the substantial weight of credible evidence requires a conclusion that the

lighting was more than bright enough to meet the standard of care.

(24)

All that the law requires of landowners-- even toward those who remain invitees- is ordinary care.  Here the government maintained a thrice daily cleaning and inspection procedure of a bathroom used by ten to fifteen people a day. The bathroom had no history of problems or safety concerns. To require Defendant to have a more frequent or rigorous inspection procedure for a bathroom with no history of trouble used by ten to fifteen people a day would require the government to exercise extraordinary care.  The ordinary care standard is clear.  So, too, is the conclusion that it was met.

For all of the foregoing reasons, the Court finds in favor of the Defendant.

**SO ORDERED** this ___21st___ day of September, 2009.

JUDGE, UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA